UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

REBECCA ROBERTSEN,       )
                                )
    Plaintiff,              )
                                )
    v.                    )     Case No: 2:09-cv-245
                                )     Mattice/Carter
MICHAEL S. ASTRUE,      )
Commissioner of Social Security,    )
                                )
    Defendant.           )

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

judicial review of the final decision of the Commissioner denying the plaintiff a period of

disability, disability insurance benefits, and supplemental security income under Title II and Title

XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1382. [1]

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule

72(b) of the Federal Rules of Civil Procedure for a report and recommendation regarding the

disposition of plaintiff's motion for summary judgment (Doc. 13) and defendant's motion

for summary judgment (Doc. 15 ).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner

be AFFIRMED.

## Plaintiff's Age, Education, and Past Work Experience

Plaintiff was considered a "younger individual" during all times relevant to this claim (Tr.

---

[1]Since the relevant DIB and SSI regulations cited herein are virtually identical, citations
will only be made to the DIB regulations, found at 20 C.F.R. §§ 404.1500-404.1599.  The
parallel SSI regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two
digits of the DIB cites (e.g., 20 C.F.R. § 404.1545 corresponds with 20 C.F.R. § 416.945).

634).  20 C.F.R. § 404.1563.  She completed tenth grade and obtained a GED, and she last worked in July 2003 (Tr. 666, 671, 1105). Plaintiff alleged she could not work due to manic depressive disorder, post traumatic stress disorder, personality disorder, "psychotic seizures," seizures, diabetes, asthma, bronchitis, a hernia, ulcers, brain tumors above the right eye, "bone problems," and respiratory problems (Tr. 659).

Applications for Benefits

Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on September 23, 2005, alleging disability since August 23, 2005 (Tr. 634-39, 1072-74).[2]  Plaintiff's insured status expired on March 31, 2007 (Tr. 640).[3]  Plaintiff's applications were denied initially and on reconsideration (Tr. 616–23, 625-28, 1076-87).  On April 10, 2007, Plaintiff appeared with her attorney and testified at a hearing before ALJ McFayden (Tr. 1102-23).  VE Robert Spangler also testified.  On June 25, 2007, ALJ McFayden found that Plaintiff retained the RFC to perform a significant number of jobs in the economy, and therefore, was not disabled (Tr. 586-93).  The Appeals Council denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner (Tr. 539-42).  20

---

[2]Plaintiff previously filed applications for DIB and SSI in September 1994 (Tr. 16). Those claims were denied initially and were not further pursued (Tr. 67-68, 476-85).  Plaintiff filed applications for DIB and SSI in August 2003 (Tr. 16, 51, 471-73).  Administrative Law Judge (ALJ) John McFayden denied the applications on August 22, 2005 (Tr. 16-26).  Plaintiff appealed the Commissioner's decision, and on January 3, 2008, the United States District Court for the Eastern District of Tennessee affirmed the ALJ's decision (Tr. 545-80).  In the current case, ALJ McFayden did not reopen his prior decision (Tr. 586).

[3]To be entitled to DIB, a claimant must show that she was disabled on or before the date her insured status expired.  20 C.F.R. § 404.131; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

C.F.R. § 404.981; 416.1481.[4]  Plaintiff seeks judicial review under 42 U.S.C. § 405(g).

Standard of Review - Findings of the ALJ

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §423(d)(1)(A).  The burden of proof in a claim for Social Security benefits is upon the claimant to show disability.  *Barnes v. Secretary, Health and Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).  Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show there is work in the national economy which he/she can perform considering his/her age, education and work experience.  *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).  Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed.  *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).  The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different

---

[4]Since the relevant DIB and SSI regulations cited herein are virtually identical, citations will only be made to the DIB regulations, found at 20 C.F.R. §§ 404.1500-404.1599.

conclusion. The substantial evidence standard allows considerable latitude to administrative

decision makers. It presupposes there is a zone of choice within which the decision makers can

go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994)

(citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and*

*Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

As the basis of the decision of May 21, 2008 that plaintiff was not disabled, the ALJ

made the following findings:

1. The claimant met the insured status requirements of the Act as of the alleged onset date.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date.

3. The claimant has "severe" impairments, including morbid obesity, diabetes, facet arthropathy of the lumbar spine, seizure disorder, depression, anxiety and a borderline personality disorder.

4. The claimant's impairments, considered individually and in combination, do not meet or equal in severity any impairment set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The testimony regarding the claimant's pain and functional limitations was not fully credible.

6. The claimant retains the residual functional capacity to perform sedentary exertion with seizure precautions with tasks involving primarily objects rather than people.

7. The claimant cannot perform any past relevant work.

8. The claimant is a younger individual.

9. The claimant has a high school (GED) education.

10. The transferability of any acquired work skills is not a material issue.

11.     The framework of Rules 201.28 and 201.29 of the Medical-Vocational Guidelines and vocational expert testimony demonstrated that the claimant has the residual functional capacity to perform jobs that exist in significant numbers in the national economy.

12.     The claimant is not disabled within the meaning of the Act.

(Tr. 586-593).

## Issue Presented

Plaintiff contends the ALJ erred in evaluating the severity of Plaintiff's mental impairments and in failing to properly consider their effect on Plaintiff's ability to work.

## Review of Relevant Evidence

*Plaintiff's Testimony and Reports*

In a report to the Agency, Plaintiff indicated her daily activities included waking up and eating breakfast, taking medication, watching television or visiting with friends and family (Tr. 691).  She sometimes helped care for her pets by bringing them water and letting them in and out to use the bathroom.  She reported she slept poorly, due to pain, and has nightmares (Tr. 692).  She indicated she could brush her own hair, feed herself, bathe herself if someone was there with her, and use the toilet, but sometimes had to be cleaned after a seizure (Tr. 692).  She was able to pay bills, count change, handle a savings account, and use a checkbook (Tr. 694).  When she did not have a headache, she read (Tr. 695).  She spent time with others, including her mother, step-mother, father, "Jericko," "Misty," and an uncle (Tr. 695).  She reported that she got along with most people (Tr. 697).

Plaintiff reported problems with memory, completing tasks, concentrating, understanding, following instructions, sitting, standing, walking, lifting, various postures, using her hands,

talking, hearing, and seeing (Tr. 696).

At the hearing, Plaintiff testified that the main reason she could not work was because she had no energy and could not concentrate due to physical conditions (Tr. 1105).  She also stated that she experienced anxiety and nervousness (Tr. 1105).  She stated that she had panic attacks, where her chest started jumping, her pulse became rapid, and she felt like she was being smothered (Tr. 1105).  She experienced panic attacks weekly (Tr. 1106).  They lasted, on average, fifteen minutes (Tr. 1106).

Plaintiff also indicated that she experienced depression (Tr. 1106).  She stated she became "really sad, and I don't think I have a place in this world." (Tr. 1106-07).  She stated she had problems sleeping, but they seemed to be due to breathing problems (Tr. 1107).

Plaintiff testified that her medication helped her depression and anxiety, but she thought her body was becoming immune to it (Tr. 1115).  She stated that she had been going to Cherokee Mental Health (Cherokee)  for psychotherapy with Mr. Miller at least once a month (Tr. 1116).

Medical Evidence

*Medical Evidence Prior to Plaintiff's Alleged Onset Date*

Prior to her alleged onset of disability, treatment records from Cherokee indicate diagnoses of major depressive disorder, recurrent; insomnia; and social anxiety (Tr. 198-200, 206-07, 218, 220-22).  Plaintiff saw staff psychiatrists Kenneth Greenwood, M.D., and Shirley Trentham, M.D., and David Miller, LCSW, for psychotherapy (Tr. 192-222).

On September 9, 2003, Plaintiff reported to Dr. Greenwood that she was doing "fairly well on her  medications she had before and was working twelve to sixteen hours a day for quite a while and just ran out of her medicine and got off of it."  (Tr. 193).  She complained of feeling

depressed, trouble sleeping, and problems with anxiety and social fear (Tr. 193).

On January 6, 2004, Plaintiff indicated some improvement in her overall mood, but still had problems with irritability and poor quality of sleep (Tr. 832). Dr. Trentham increased Plaintiff's dosage of Zoloft and initiated Ambien for insomnia (Tr. 833).

On February 18, 2004, at a treatment plan review, Mr. Miller diagnosed Plaintiff with depressive disorder, recurrent, severe, with psychosis; anxiety state; and borderline personality disorder (Tr. 830). He indicated a current Global Assessment of Functioning (GAF) score of 52[5] (Tr. 830).

On April 22, 2004, Dr. Trentham saw Plaintiff for a follow-up (Tr. 395). Plaintiff had stopped taking Ambien, because it was causing her to feel groggy in the morning, but since stopping it, she had not been sleeping well (Tr. 395). Plaintiff indicated that she was doing "fairly well with the medicines as currently written, but she does not feel there has been significant improvement yet with the Effexor" (Tr. 395). When Dr. Trentham discussed increasing her dosage, Plaintiff disclosed that she had been taking Effexor "whenever I remember to take it" (Tr. 395). On examination, Plaintiff was pleasant and cooperative (Tr. 395). Her mood was okay, affect was cooperative, thought processes were goal directed and logical, and insight and judgment were fair (Tr. 395). Dr. Trentham reported that Plaintiff's depression was improving (Tr. 395). She was given prescriptions for Zoloft, Effexor, and Sontata for insomnia (Tr. 395).

At a treatment plan review on August 18, 2004, Mr. Miller again diagnosed Plaintiff with

---

[5]A GAF score of 51 to 60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (Text Revision 4th ed. 2000) (DSM-IV-TR) at 34.

depressive disorder, recurrent, severe, with psychosis; anxiety state; and borderline personality disorder; and he indicated a current GAF score of 50 (Tr. 828).

On September 23, 2004, Plaintiff saw, for the first time, Sukhender Karwan, M.D., another staff psychiatrist, at Cherokee (Tr. 394). She indicated that she had run out of Zoloft a couple of weeks ago (Tr. 394). On examination, Plaintiff was pleasant, cooperative, and not in acute distress; her thought process and thought content showed some elements of frustration and helplessness (Tr. 394). Dr. Karwan diagnosed generalized anxiety disorder; major depression, recurrent; possible panic disorder with agoraphobia; and obesity (Tr. 394). Dr. Karwan switched Plaintiff from Zoloft to Prozac (Tr. 394). On October 7, 2004, Dr. Karwan reported improvement in Plaintiff's mood swings, irritability, anxiety, and depression (Tr. 826).

On October 21, 2004, Dr. Karwan and Mr. Miller completed a Medical Assessment of Ability to Do Work-Related Mental Activities (Tr. 392-93). They opined that Plaintiff had poor to no ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, understand, remember, and carry out complex or detailed job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability (Tr. 393-93). They opined she had fair abilities to follow work rules, use judgment with the public, function independently, and understand, remember, and carry out simple job instructions (Tr. 392-93).

On December 7, 2004, Dr. Karwan saw Plaintiff for a follow-up; she complained of obsession and ritual activity for the past two months (Tr. 825). Dr. Karwan increased her dosage of Prozac to see if it helped the intrusion and ritualistic activity (Tr. 825). On February 4, 2005, Plaintiff continued to engage in ritualistic compulsive acts, and Dr. Karwan reported that

Plaintiff met the criteria of obsessive compulsive disorder (OCD), in addition to generalized anxiety disorder, major depression (Tr. 824).[6] Plaintiff was started on Abilify and Klonopin (Tr. 825).

At a treatment plan review on February 18, 2005, Mr. Miller's diagnoses remained the same, and he indicated a current GAF score of 53 (Tr. 823).

On March 18, 2005, Plaintiff reported to Dr. Karwan that some of her OCD symptoms were in control, that she was not resorting to ritualistic activities like before, but her sleep cycle was very erratic (Tr. 822).

On June 23, 2005, Plaintiff reported slow but steady progress in her mental status. Dr. Karwan reported significant improvement in Plaintiff's mental status and indicated a slight improvement in her GAF. (Tr. 821).

On July 7, 2005, Mr. Miller saw Plaintiff. Her mental status findings were normal, neither hallucinations nor delusions were present. Mr. Miller indicated Plaintiff presented in fair mood, but was worried about changes in the TennCare program. (Tr. 511).

On July 28, 2005, Mr. Miller saw Plaintiff. Her mental status findings remained the same, except her mood was depressed and anxious. Mr. Miller indicated that Plaintiff presented with mild depressive and anxious symptoms. (Tr. 510).

On August 18, 2005, Mr. Miller performed a treatment plan review; he again diagnosed depressive disorder, recurrent, severe, with psychosis; anxiety disorder, generalized; and borderline personality disorder; and he assessed a current GAF score of 58 (Tr. 506). Mr. Miller

---

[6] In addition to listing generalized anxiety disorder and major depression, Dr. Karwan listed a third mental condition — "personality traits of borderline [ ]," which appears to be incomplete in description.

also completed a functional assessment indicating that Plaintiff had no limitations with activities of daily living or interpersonal functioning or concentration, task performance, and pace; and she had moderate limitations in her ability to adapt to changes (Tr. 507-08).

On August 22, 2005, Mr. Miller saw Plaintiff. Her mental status findings were normal. Mr. Miller indicated that Plaintiff presented in fair and significantly improved mood. (Tr. 505).

*Medical Evidence After Plaintiff's Alleged Onset Date*

On September 12, 2005, Mr. Miller saw Plaintiff. Her appearance was appropriate, attitude was cooperative, motor activity was calm, affect was appropriate, mood was depressed and anxious, speech was normal, and thought process was intact. Mr. Miller indicated that Plaintiff presented with a depressed mood and anxiety (Tr. 504).

On September 22, 2005, Plaintiff told Dr. Karwan that she had been disenrolled by her health plan (Tr. 503). He recommended Plaintiff resume Prozac and take Clonazepam and encouraged her to remain in therapy (Tr. 503).

On October 10, 2005, Mr. Miller saw Plaintiff. Her mental status findings remained the same as in September. Mr. Miller indicated that Plaintiff presented with depressed mood and anxiety reporting much concern over not having health coverage (Tr. 501).

A week later, Mr. Miller saw Plaintiff again. Again, her mental status findings continued to be normal, except her mood was depressed. Mr. Miller indicated that Plaintiff presented in depressed mood, but appeared slightly improved from their last contact. (Tr. 500).

On December 12, 2005, Mr. Miller saw Plaintiff. Her mental status findings remained normal, except her mood was depressed and anxious. Mr. Miller indicated that Plaintiff presented with "mild anxiety and depressed mood" and reported relationship issues with her

boyfriend. (Tr. 496).

On January 9, 2006, Mr. Miller saw Plaintiff. Her mental status findings remained the same as in December, but her mood was depressed. Mr. Miller indicated that Plaintiff presented in "mildly depressed mood" and continued to work on relationship issues, but financial stressors were significant that day. (Tr. 495).

On January 28, 2006, Rebecca Joslin, Ed.D, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique Form (PRTF) and Mental Residual Functional Capacity (MRFC) Assessment (Tr. 944-61). Dr. Joslin considered the record evidence, including treatment notes from Cherokee through December 2005 (Tr. 956). In the PRTF, Dr. Joslin indicated that Plaintiff had major depressive disorder, generalized anxiety disorder, OCD, and a personality disorder which resulted in mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, or pace (Tr. 944-54). In section I of the MRFC Assessment, she opined that Plaintiff had marked limitations in interacting appropriately with the general public, as well as moderate limitations in six out of twenty areas (Tr. 958-59). In the remaining thirteen areas, Plaintiff was not significantly limited (Tr. 958-59). In section III of the MRFC Assessment, Dr. Joslin indicated Plaintiff's functional capacity assessment. She opined Plaintiff was able to understand and remember simple and detailed instructions; was able, with some difficulty, to maintain attention, concentration, persistence, and pace and be around others without distraction; was unable to interact appropriately with the general public; and was able, with some difficulty, to adapt to changes (Tr. 960).

On February 7, 2006, Mr. Miller saw Plaintiff. Her mental status findings were normal, except her mood was depressed and anxious. Mr. Miller indicated that Plaintiff presented in

"mildly depressed mood with anxiety mainly related to her financial situation" (Tr. 494).

On February 17, 2006, Mr. Miller performed a treatment plan review in which he continued to diagnose Plaintiff with depressive disorder, recurrent, severe, with psychosis, anxiety disorder, generalized, and borderline personality disorder, and he assessed a current GAF score of 52 (Tr. 493).

On March 7, 2006, Dr. Karwan saw Plaintiff for a follow-up. Plaintiff indicated that she could not afford any of her "medical medication." On examination, Plaintiff's affect was appropriate, but she had high intensity of anxiety. His impression was, major depression recurrent, generalized anxiety disorder. Dr. Karwan continued Plaintiff on Prozac and reduced the dosage of Clonazepam (Tr. 491).

On April 10, 2006, Mr. Miller saw Plaintiff. Her mental status findings were the same as in February. Mr. Miller indicated that Plaintiff presented with "mild depression and anxiety reporting continued distress due to her weight and other health concerns." Also, Plaintiff worked on relationship issues (Tr. 487).

On June 5, 2006, Mr. Miller saw Plaintiff. Her mental status findings remained the same, except her mood was depressed. Mr. Miller indicated that Plaintiff presented in "mildly depressed mood and talks through concerns about her physical health and lack of health coverage. [She] also works through an interpersonal issues." (Tr. 1042).

On July 13, 2006, Mr. Miller saw Plaintiff. Again, on mental status examination, Plaintiff's appearance was appropriate, attitude was cooperative, motor activity was calm, affect was appropriate, speech was normal, and thought process was intact; however, her mood was depressed (Tr. 1038).

On August 15, 2006, Mr. Miller performed a treatment plan review in which Plaintiff's diagnoses remained the same, and he assessed a current GAF score of 55 (Tr. 1034). He also completed a functional assessment indicating that Plaintiff had no limitations with activities of daily living or interpersonal functioning (Tr. 1035).

On August 28, 2006, Dr. Karwan and Mr. Miller signed a Medical Assessment of Ability to Do Work-Related Mental Activities. They opined that Plaintiff had poor to no abilities to relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, understand, remember, and carry out complex job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. They opined she had fair abilities to follow work rules, function independently, understand, remember, and carry out detailed and simple job instructions, and maintain personal appearance. As support, they indicated that Plaintiff was diagnosed with major depression with a history of psychosis, generalized anxiety disorder, and borderline personality disorder, which negatively affected her ability to relate to others, concentrate, deal with the public, stay motivated, remember, and generally get along with others (Tr. 794-95)

On September 21, 2006, Mr. Miller saw Plaintiff. Plaintiff's appearance was appropriate, attitude was cooperative, motor activity calm, affect was appropriate, mood was depressed, speech was normal, and thought process was intact. Mr. Miller indicated that Plaintiff presented with "mild depressive symptoms and remains concerned about her physical health and lack of health coverage. [She] also continues to work on relationship issues" (Tr. 1033). On October 2, 2006, Plaintiff's presentation was the same, except her mood was anxious, and Mr. Miller

13

indicated she presented with anxiety mostly having to do with relationships and sex (Tr. 1032).

On October 12, 2006, Dr. Karwan saw Plaintiff, who was consumed with psychosocial issues and personal issues. She wanted to lose weight and achieve it very fast, and it was causing a lot of anxiety. Dr. Karwan's impression was major depression, generalized anxiety disorder and borderline personality disorder per chart. Dr. Karwan continued Plaintiff on her medications. (Tr. 1031).

On October 23, 2006, Mr. Miller indicated no change in Plaintiff's mental status, except her mood was depressed. He indicated that Plaintiff presented with mild depressive symptoms, but appeared to be doing generally better. She has been attending water aerobics and is seeing some results (Tr. 1029).

On November 13, 2006, Mr. Miller indicated no change in Plaintiff's mental status. He indicated that Plaintiff presented in a mildly depressed mood (Tr. 1028). On December 11, 2006, Plaintiff's mood was anxious, but otherwise her presentation was the same. Mr. Miller indicated Plaintiff presented with mild anxiety (Tr. 1027).

On January 8, 2007, Plaintiff's mental status remained the same as in December 2006. Mr. Miller noted that Plaintiff presented in fair and improved mood, but had some anxiety (Tr. 1024).

On January 12, 2007, Plaintiff presented for a medication check with Dr. Karwan. She was consumed with her health problems. On examination, she appeared slightly depressed, withdrawn, and frustrated. Dr. Karwan encouraged Plaintiff to remain in therapy and continued her on Prozac and Klonopin (Clonazepam) (Tr. 1026).

On February 8, 2007, Plaintiff's mental status remained the same, but her mood was depressed and anxious. Plaintiff talked about a recent fight with her boyfriend and discussed sexual orientation issues with Mr. Miller (Tr. 1023).

*Vocational Expert Testimony*

Mr. Spangler, a VE, testified at the hearing (Tr. 1118). The ALJ asked the VE to assume a younger individual with a GED and below average IQ, who read on a high school level, and who was limited to sedentary work, with seizure precautions; ideally the person should work around things rather than people, but it was not precluded (Tr. 1118). The VE testified that the individual could perform about 9,000 jobs in the region, such as bookkeeping clerk, credit checker, interviewer, order clerk, factory messenger using email, expediting clerk, word processing clerk, electromechanical assembler, inspector, production worker, and truck sales worker (Tr. 1118-19).

If Plaintiff's testimony concerning the extent of her limitations was accepted, the VE testified the individual could not perform any jobs (Tr. 1119). If the individual had moderate limitations in the ability to maintain attention and concentration for extended periods of time, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without rest periods that were unreasonable in number or length, to accept instructions and respond appropriately to criticisms from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting; and had a marked limitation in the ability to

interact appropriately with the general public,[7] she could not perform any jobs (Tr. 1120-21). If the individual had poor to no abilities to maintain attention and concentration, deal with work stresses, interact with supervisors, deal with the public, relate to coworkers, and demonstrate reliability,[8] the individual could not perform any jobs (Tr. 1121). Also, if the individual had to miss one day per month on a regular sustained basis, she could not perform any jobs (Tr. 1121).

## Analysis

After reviewing the record the ALJ rejected Plaintiff's allegations of complete disability and found Plaintiff's impairments did not preclude her from performing all work activity. The ALJ found Plaintiff had the RFC to perform sedentary exertional work that involved working primarily with objects rather than people (Tr. 591). She would also need seizure precautions, such as no exposure to hazardous heights or machinery (Tr. 591).

Plaintiff contends the ALJ erred in evaluating the severity of Plaintiff's mental impairments and in failing to properly consider their effect on Plaintiff's ability to work (Doc. 14, Pl's Brief at 11-17). Plaintiff has some physical limitations related to obesity, left knee problems, facet joint arthropathy in her back as well as poorly controlled diabetes which conditions were addressed by the ALJ and accommodated by restriction of Plaintiff to sedentary exertion (Tr. 591). Plaintiff did not allege any other error regarding the ALJ's decision beyond the mental impairments. She does not challenge the ALJ's consideration of her physical impairments. Therefore, Plaintiff has waived her right to raise all other issues. *See Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir.

---

[7]These were limitations indicated by the state agency physician, Dr. Joslin, in section I of the Mental Residual Functional Capacity Assessment (Tr. 958-59).

[8]These were limitations indicated by Dr. Karwan and Mr. Miller in August 2006 (Tr. 794-95).

1991) (waiver of issue not raised in district court brief).

Plaintiff argues that the ALJ erred in rejecting the opinion of treating physicians Dr. Karwan and Mr. Miller, and the opinion of the state agency psychologist, Dr. Joslin (Doc. 14, Plaintiff's Brief at 12-15)  She contends the opinions of these medical sources supported a finding of disability.  However, I conclude the ALJ considered the opinions of these medical sources.  He rejected the ultimate opinion of Dr. Karwan and Mr. Miller but incorporated some of their findings as contained in their treatment notes and the opinion of Dr. Joslin in his mental RFC assessment (Tr. 590-91).

On August 28, 2006, Dr. Karwan and Mr. Miller opined that Plaintiff had no useful ability to function in ten out of fifteen areas of occupational adjustments, performance adjustments, and personal-social adjustments, and only fair (ability to function is seriously limited, but not precluded) ability to perform in the remaining five areas (Tr. 794-95).  As support, Dr. Karwan and Mr. Miller indicated that Plaintiff was diagnosed with major depression with a history of psychosis, generalized anxiety disorder, and borderline personality disorder, which negatively affected her ability to relate to others, concentrate, deal with the public, stay motivated, remember, and generally get along with others (Tr. 794).  Plaintiff contends their opinion was entitled to controlling weight (Doc. 14, Plaintiff's Brief at 13-14).  However, the regulations do not require controlling weight be given to the opinion of a treating source if the opinion is not well-supported by the clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-2p.  The ALJ considered the opinion provided by Dr. Karwan and Mr. Miller, but determined that it was not supported by the record evidence, and not supported by their own treatment notes.  Mr.

Miller, who provided psychotherapy to Plaintiff, repeatedly made normal findings on mental status examinations; both prior to, and during, the relevant period, he reported that Plaintiff's appearance was appropriate, her attitude was cooperative, her motor activity was calm, her affect was appropriate, her speech was normal, and her thought process was intact (Tr.487, 494-96, 500-01, 504-05, 510-11, 1023, 1027-29, 1032-33, 1038, 1042). Further, although Plaintiff demonstrated a depressed and/or anxious mood on mental status examinations, Mr. Miller repeatedly described that Plaintiff had only mild depression and anxiety (Tr. 487, 494-96, 510, 1027-29, 1033, 1042). Further, since February 2005, Mr. Miller indicated GAF scores ranging between 52 and 58, which indicated only "moderate" symptomology (Tr. 493, 506, 823, 1034); *DSM-IV* at 34. The ALJ concluded that the findings contained in the psychotherapy notes and mental assessments indicated, at most mild to moderate limitations, and did not support the extreme opinion of Dr. Karwan and Mr. Miller that Plaintiff had no ability to function in so many areas. *See* 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, . . . , the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Thus, based on the lack of support in their own treatment notes, the ALJ rejected the August 2006 opinion of Dr. Karwan and Mr. Miller.

In making his RFC finding, the ALJ decided to rely on the opinion of the state agency psychologist, Dr. Joslin. In January 2006, Dr. Joslin reviewed the evidence, including Plaintiff's diagnoses of major depressive disorder, generalized anxiety disorder, OCD, and personality disorder (Tr. 944-54). She reviewed evidence from Cherokee through December 2005 (Tr. 956). Dr. Joslin completed a MRFC Assessment and indicated in section I that Plaintiff had marked

18

limitations in interacting appropriately with the general public, and moderate limitations or no significant limitations in remaining nineteen out of twenty areas (Tr. 958-59).

Plaintiff points to the testimony of the VE that Plaintiff could not perform any work if she was impaired to the extent found by the VE in Section I of the MRFC Assessment and argues the ALJ erred by failing to mention such limitations or explain why he did not include them in his RFC finding (Doc. 14, Plaintiff's Brief at 14-15).   However, the ALJ explicitly considered that Plaintiff had a marked limitation in her ability to interact with the general public, and no more than moderate limitations in the remaining areas (Tr. 591).  As the Commissioner argues, section I of the MRFC Assessment is entitled "Summary Conclusions," and it is defined as "merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of the documentation and does not constitute the RFC assessment." Social Security Administration's Program Operations Manual System (POMS) DI 24510.060.[9]  Section III of the MRFC Assessment form is entitled "Functional Capacity Assessment" and "is for recording the mental RFC determination.  It is in this section that the actual mental RFC assessment is recorded, explaining the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings."  POMS DI 24510.060.  Dr. Joslin's indication that Plaintiff had "marked" and "moderate" limitations in section I of the MRFC Assessment was merely a preliminary finding used to make her RFC determination in section III.  And, it was not appropriate for the ALJ to include these limitations in his RFC finding, contrary to Plaintiff's contention, because Dr. Joslin's assessment is found in

_____

[9]POMS is the means for issuing official Agency policy and operating instructions regarding the Agency's programs.  *See* POMS AO 10020.010.

section III.

In section III of the MRFC Assessment, Dr. Joslin opined that Plaintiff was able to understand and remember simple and detailed instructions; was able, with some difficulty, to maintain attention, concentration, persistence, and pace and be around others without distraction; was able, with some difficulty, to adapt to changes; and was unable to interact appropriately with the general public (Tr. 960). "State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2)(i). Dr. Joslin completed the MRFC Assessment in accordance with Agency policy, and indicated Plaintiff's mental RFC in section III of the MRFC Assessment.

Although the ALJ did not expressly discuss Dr. Joslin's section III conclusions in his discussion, it is clear that he considered Dr. Joslin's MRFC Assessment, based on his discussion of it in his decision (Tr. 591). And, he took into account the mental RFC assessment indicated by Dr. Joslin in section III of the MRFC Assessment when making his RFC finding. The ALJ provided Plaintiff with an even broader limitation regarding her interactions with others than did Dr. Joslin; the ALJ limited Plaintiff to work that involved working primarily with objects rather than people (Tr. 591). This limitation would include the general public. Thus, Dr. Joslin's opinion supported the ALJ's mental RFC finding. Contrary to Plaintiff's suggestion, the ALJ did not ignore Dr. Joslin's opinion, but rather gave it weight and incorporated it in his RFC finding. In his opinion the ALJ provided the following analysis of the findings of the treating physician and of the State Agency Physician:

With regard to her mental impairments, the record suggests she is primarily struggling with relationship and financial stressors. There is indication that she is responsive to medication despite non-compliance. Dr. Karwan and Mr. Miller (psychiatrist and therapist, respectively) submitted a rather dire assessment of her ability to perform work-related activities. Yet, her mental status examinations have not suggested problems of such severity. David Miller repeatedly describes mild depression and anxiety. This description is fairly consistent with the Global Assessment of Functioning scores found throughout the progress notes from Cherokee Health Services, which typically fall between 50 and 59, indicating "moderate" symptoms. One would not expect a person with moderate anxiety, depression and a personality disorder to have poor to no ability to function in so many areas. Accordingly, the assessment from Dr. Karwan and Mr. Miller is not entitled to great weight as it is not supported by the record, including their own progress notes. The state agency psychological consultant who reviewed the documentary evidence in January 2006, found the claimant to be markedly limited in her ability to interact with the general public, but otherwise found no more than moderate limitations (Exhibit B8F). The undersigned concurs with this conclusion. Using the "B" criteria set forth in the listed impairments, the undersigned finds the claimant has moderate limitations in the area of social functioning and in the area of concentration, persistence or pace. She has no more than mild limitations in activities of daily living and there is no history of episodes of decompensation. Though she has moderate limitations in the area of concentration, persistence or pace, these limitations would not preclude the performance of unskilled work activity.

(Tr. 5 and 6).

I must determine if there is substantial evidence to support this conclusion. In this case, as in many cases, there is evidence in the record which supports a finding of disability. In fact, there is an opinion of a treating physician which if accepted and given controlling weight, would direct a conclusion that Plaintiff is disabled. This treating physician did have a long treatment history with Plaintiff. However, the treating physician rule, which gives greater, and sometimes controlling, weight to the treating physician is based on the assumption that a medical professional who has dealt with a claimant over a long period of time has a deeper insight into the claimant's condition than one who has examined a claimant but once or simply reviewed the

medical evidence. *See Barker v. Shalala*, 40 F.3d 789 (6th Cir. 1994). The ALJ is not required to

accept any medical opinion, even that of a treating physician, if that opinion is not supported by

sufficient clinical findings. *See* 20 C.F.R. § 404.1527(d)(3); *Bogle v. Sullivan*, 998 F.2d 342, 347

(6th Cir. 1993) ("This court has consistently stated that the [Commissioner] is not bound by the

treating physician's opinions, and that such opinions receive great weight only if they are

supported by sufficient clinical findings and are consistent with the evidence."). As stated above,

the ALJ rejected the disabling limitations assessed by the treating physicians because the opinion

was inconsistent with their own treating records which often had references to mild depression,

inconsistent with the assessed GAF and inconsistent with the assessment of Dr. Joslin.

I conclude there is substantial evidence to support the ALJ's evaluation of Plaintiff's mental

conditions and it was reasonable for him to conclude, based on the record evidence, that she

could perform a range of sedentary work that involved working primarily with objects rather than

people.

Finally, substantial evidence supports the ALJ's finding that Plaintiff could perform a

significant number of jobs. After determining Plaintiff's RFC, the ALJ asked the VE to assume

an individual of Plaintiff's vocational background who was limited to sedentary work, with the

seizures precautions, and who ideally should work around things rather than people, but it was

not precluded (Tr. 1118). The VE testified the individual could perform about 9,000 jobs in the

region such as bookkeeping clerk, credit checker, interviewer, order clerk, factory messenger

using email, expediting clerk, word processing clerk, electromechanical assembler, inspector,

production worker, and truck sales worker (Tr. 1118-19).

As the Commissioner argues, although the jobs of interviewer and truck sales could involve

working with the general public, the majority of the jobs indicated would not require interaction with the general public. Thus, based on the VE's testimony, the ALJ reasonably found that Plaintiff could perform a significant number of jobs in the economy. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 149-50 (vocational expert's testimony meets Commissioner's burden at step five of the sequential evaluation).

The Plaintiff argues the ALJ's hypothetical question to the VE did not accurately portray her mental limitations, (Doc. 14, Plaintiff's Brief at 13-14). This constitutes a challenge to the ALJ's RFC finding, and as indicated above, I conclude the ALJ reasonably rejected the extreme limitations proposed in the August 2006, assessment from Dr. Karwan and Mr. Miller. I also conclude the ALJ did give weight to the opinion of Dr. Joslin, which the ALJ concluded to be more consistent with the record evidence and that the ALJ reached his assessment of Plaintiff's RFC in part on the basis of the opinion of Dr. Joslin and in port on the treatment notes and GAF assessments of Dr. Karwan and Mr. Miller.

Therefore, the VE's responses to Plaintiff's hypothetical questions do not require reversal or remand. *See Casey*, 987 F.2d at 1235 ("It is well-established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible."). The ALJ simply did not conclude Plaintiff to be so limited. The ALJ's hypothetical question to the VE accurately portrayed the limitations supported by the evidence of record and found by the ALJ to exist. The VE's response to the ALJ's hypothetical question provided substantial evidence to support the ALJ's finding that Plaintiff could perform a significant number of jobs.

<u>Conclusion</u>

Having carefully reviewed the entire administrative record and the briefs of the parties filed in support of their respective motions, I conclude there is substantial evidence in the record to support the findings of the ALJ and the decision of the Commissioner, and neither reversal nor remand is warranted on these facts. Accordingly, I RECOMMEND:

(1)  The plaintiff's motion for judgment on the pleadings (Doc. 13) be DENIED.

(2)  The defendant's motion for summary judgment (Doc. 15) be GRANTED.

(3)  The case be DISMISSED. [10]

*s/William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[10]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general.  *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).